# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| MARATHON E.G. HOLDING LIMITED and MARATHON E.G. PRODUCTION LIMITED,<br>Plaintiffs,<br><br>v.<br><br>CMS ENTERPRISES COMPANY,<br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. H-07-2990 |

## MEMORANDUM AND ORDER

In this contract indemnification case, the Court previously issued a Memorandum and Order [Doc. # 24] ("M&O") denying partial summary judgment to Defendant CMS Enterprises Company ("CMS"). Plaintiffs Marathon E.G. Holding Ltd. and Marathon E.G. Production Ltd. (collectively, "Marathon") have now filed a Motion for Partial Summary Judgment ("Motion") [Doc. # 26], as ordered by the Court in the M&O.[1] The Court heard oral argument on June 26, 2008. The matter is ripe for disposition. In light of the parties' comprehensive briefing, all applicable legal authorities, and the full record, the Court reconsiders its original ruling denying partial summary judgment to CMS. The Court now concludes that Plaintiffs' Motion

---

[1]   Defendant has responded [Doc. # 27], and Plaintiffs have filed a reply [Doc. # 31].

should be **denied** and that partial summary judgment should be **granted** in favor of

Defendant CMS.  In particular, the Court concludes, first, that Section 7.03(a) of the

Stock Purchase Agreement is not ambiguous when read from the perspective of a

"reasonably intelligent person" who is "acquainted with all operative usages" in the

relevant industry and knows "all the circumstances prior to and contemporaneous with

the making of the integration."[2]  The Court further concludes that Section 7.03(a) is

subject to one reasonable reading, namely, that Section 7.03(a) does not provide for

indemnity to Marathon for the $2.75 million tax payment at issue.

# I.    <u>BACKGROUND</u>

The relevant facts are set out fully in the previous M&O.  The parties join issue

over the indemnification provision in Section 7.03(a) of the Stock Purchase

Agreement ("SPA"), which provides in pertinent part:

> 7.03   <u>Indemnification by Seller</u>.  Seller [CMS] hereby agrees to protect,
> defend, indemnify and hold harmless the Buyer Indemnified Parties
> [including Marathon], the Companies and the Alba Companies from and
> against, and agrees to pay (a) ***any Taxes*** (net of any realized Tax benefits
> associated therewith) of the Companies or the Alba Companies (but only
> in an amount proportional to Seller's direct or indirect interest in the
> relevant Alba Company for the period to which such Taxes relate)
> ***attributable to the time period prior to January 1, 2002*** (including, for
> the avoidance of doubt, any Taxes of the Companies or the Alba
> Companies for the period prior to January 1, 2002 that are set forth on

---

[2]    *Watkins v. Petro-Search, Inc.*, 689 F.2d 537, 538 (5th Cir. 1982) (quoting *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)).

Schedule 4.14) but only to the extent such Taxes exceed the amount reserved for Taxes on the Settlement Statement . . .[3]

Marathon argues that, pursuant to this provision, CMS is obligated to indemnify Marathon for a $2.75 million tax payment made to the Equatorial Guinea ("EG") government in 2007, arising from a 2007 Settlement Agreement between Marathon and the EG Government.  The Settlement Agreement was the culmination of years of negotiations between Marathon and EG.[4]  That agreement provided in essence that, in final settlement for all tax claims for the years 1997-2001, Marathon would reduce its net operating loss ("NOL") by $11 million, which the agreement said "result[ed] in" the $2.75 million tax payment at issue.  Specifically, the Settlement Agreement stated:

> (b)    In settlement of all claims contained in the Tax Audits for 1997, 1998, 1999, 2000 and 2001, Marathon will reduce its December 31, 2001 tax loss carry forward position by USD $11,000,000.
>
> *    *    *    *
>
> (d)    As a result of this [S]ettlement Agreement, the cumulative Tax Loss Position of Marathon E.G. Production Ltd. at December 31, 2001 will be reduced by USD $11,000,000 to USD $18,413,997. This Tax Loss position reduction will result in additional taxes

---

[3]    SPA (Exhibit 1 to Plaintiffs' Response [Doc. # 18]), at 31 (emphasis added).

[4]    Agreement for Final Settlement of All Outstanding Audit Claims & Assessments for the Audit Period 1997-2001 (Exhibit 8 to Plaintiffs' Response to Defendant's MPSJ [Doc. # 18]) ("Settlement Agreement").

paid to the State of USD $2,750,000.[5]

Based on the parties' limited original briefing, the Court denied CMS summary judgment and directed the parties to show cause why partial summary judgment should not be granted in favor of Marathon.  Seminal to this ruling were lay dictionary definitions of the word "attributable" cited by all parties.[6]   In the second round of briefing, however, CMS has presented probative new evidence particular to the field of international tax, and has made more substantial argument about pertinent industry standards concerning the focal SPA term "attributable to."   Marathon does not controvert this new evidence.   Agreeing that the $2.75 million tax payment paid in 2007 was part of Marathon's liability for tax year 2005, and that tax year 2005 was the first year that Marathon was in a tax paying position in EG,  Marathon urges that the payment was brought about *both* by Marathon's earnings in 2005 putting it for the first time in a tax paying position *and* the $11 million NOL reduction for the years 1997-2001.[7]   The Court first summarizes the applicable legal principles and then

---

[5]     Settlement Agreement, at 1, ¶¶  2(b), 2(d).

[6]     M&O [Doc. # 24], at 9 ("Both dictionary definitions appear to support Plaintiff's argument that the $2.75 million payment is 'attributable to' the period 1997-2001 . . .").

[7]     The parties refer to the testimony of Mike Boyd, a tax attorney for Marathon, who explained the $2.75 million tax payment at his deposition:

(continued...)

presents its analysis.

---

      (...continued)

    A.    . . . [B]ecause Marathon is now a taxpayer, that [NOL reduction] that occurred in 2001 results in understated income in 2005, which is the, you know, the time period we're in or the time period we're after.  And so, therefore, the 2005 tax return and the NOL that [was] reported on it as well as all the way back to 2001 were inaccurate, and they essentially needed to be amended.  In lieu of amending, we'll go ahead and make a cash payment for that amount.

    Q.    The first time that a cash payment would be required to be made, however, was for the tax year 2005?

    A.    Correct.

    Q.    That was the first year that Marathon was in a—whatever you want to call it—tax positive or net income positive?  How would you as a tax person describe that?

    A.    I always call it a tax paying position.

    Q.    A tax paying position.  And the first year for which that obtained would have been 2005?

    A.    Correct.

    Q.    And . . . $2,750,000 pertains to the 11 million-dollar NOL reduction to settle the audits vis-a-vis the old CMS companies, is that correct?

    A.    That is correct.

                *    *    *    *

    Q.    And is it your understanding that in this lawsuit Marathon is making claim for the $2,750,000?

    A.    Yes.

    Q.    And that 27—2.75 million came into existence, so to speak, through the circumstances that we just described; namely, the NOL reduction coupled with in 2005 Marathon then being in a tax paying position?

    A.    Correct.

Deposition of Mike Boyd (Appendix 1 to CMS's Response [Doc. # 27]), at 1:10-11. Mr. Boyd also testified that Marathon owed no income taxes to EG for tax years 1997 though 2004, either before or after the Settlement Agreement.  *Id*. at 1:14-15.  Based on this evidence, and the specialized definition of "attributable to," CMS argues that the $2.75 million payment is attributable to 2005, and not to earlier years.

## II.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.[8]   In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[9]

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact."[10]   The moving party, however, need not negate the elements of the non-movant's case.[11]   The moving party may meet its burden by pointing out "'the

---

[8]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).

[9]    FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).

[10]    *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).

[11]    *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).

absence of evidence supporting the nonmoving party's case.'"[12]

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial.[13]  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[14]

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party.[15]  However, factual controversies are resolved in favor of the non-movant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts."[16]  The non-movant's burden is not

---

[12]    *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)).

[13]    *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted).

[14]    *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

[15]    *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

[16]    *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999).

met by mere reliance on the allegations or denials in the non-movant's pleadings.[17]
Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not
meet this burden.[18]  Instead, the nonmoving party must present specific facts which
show "the existence of a 'genuine' issue concerning every essential component of its
case."[19]  In the absence of any proof, the court will not assume that  the non-movant
could or would prove the necessary facts.[20]

Affidavits cannot preclude summary judgment unless they contain competent
and otherwise admissible evidence.[21]   A party's self-serving and unsupported
statement in an affidavit will not defeat summary judgment where the evidence in the
record is to the contrary.[22]

Finally, "[w]hen evidence exists in the summary judgment record but the
nonmovant fails even to refer to it in the response to the motion for summary

---

[17]  *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002).

[18]  *Morris v. Covan World Wide Moving, Inc.*,  144 F.3d 377, 380 (5th Cir. 1998).

[19]  *Id.*

[20]  *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

[21]  *See* FED. R. CIV. P. 56(e); *Love v. Nat'l Medical Enters.*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003).

[22]  *See In re Hinsely*, 201 F.3d 638, 643 (5th Cir. 2000).

judgment, that evidence is not properly before the district court. Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."[23]

## III.   ANALYSIS

### A.   Principles of Contract Construction

Indemnity contracts are construed according to general contract principles, giving meaning to each of a contract's provisions.[24]   A court must "ascertain the meaning that would be attached to the wording 'by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended to mean.'"[25]

Determining whether a contract is ambiguous, and interpreting an unambiguous contract, are questions of law.[26]   "If a question relating to a contract's construction or

---

[23]   *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (internal citations and quotations omitted).

[24]   *Fireman's Fund Ins. Co. v. Murchison*, 937 F.2d 204, 207 (5th Cir. 1991).

[25]   *Watkins v. Petro-Search, Inc.*, 689 F.2d 537, 538 (5th Cir. 1982) (quoting *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)). *Accord City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968) (quoting RESTATEMENT OF THE LAW OF CONTRACTS § 230 (1932)).

[26]   *Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 712 (5th Cir. 2005); *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987).

ambiguity arises, the court examines the contract's wording in context of the surrounding circumstances."[27]   A contract is ambiguous if it is reasonably subject to more than one meaning ***after*** application of established rules of contract construction.[28]

Under Texas law, indemnity agreements are to be strictly construed in favor of the indemnitor, and the indemnity must be explicit.[29]   Courts must first apply the general contract construction rules, and must determine the intent of the parties while ascribing the indemnity agreement's terms their "ordinary, popular, and commonly accepted meaning."[30]   Once a court has determined the parties' intent, the indemnitor is entitled to have the agreement strictly construed so as not to extend the agreement, by construction or implication, beyond its plain terms.[31]   This doctrine of strict

---

[27]     *Interstate Contracting Corp*, 407 F.3d at 712.

[28]     *Air Liquide Am. Corp. v. Crain Bros. Inc.*, 11 F. Supp. 2d 709, 713 n.7 (S.D. Tex. 1997) (Atlas, J.) (citing *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 99 F3d 695, 700 (5th Cir. 1996); *Thrift v. Estate of Hubbard*, 44 F.3d 348, 357-58 & n.20 (5th Cir. 1995); *Hanssen v. Quantas Airways Ltd.*, 904 F.2d 267, 269 (5th Cir. 1990); *Watkins*, 689 F.2d at 538)).

[29]     The presumptions in insurance law and indemnity law are "diametrically opposed." *Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 492 (5th Cir. 2000). Insurance policies are strictly construed in favor of coverage, but indemnity agreements are strictly construed in favor of the indemnitor, *i.e.*, no indemnity.  *Id.*

[30]     *Hudson v. Hinton*, 435 S.W.2d 211, 214 (Tex. Civ. App. – Dallas 1968, no writ).

[31]     *McClane v. Sun Oil Co.*, 634 F.2d 855, 859 (5th Cir. 1981) ("once the intent of the
(continued...)

construction is "a rule of substantive law applicable only after the parties' intent has been ascertained through ordinary rules of construction."[32]

## B.    Contractual Language and Surrounding Circumstances

### 1.    "Any Taxes"

Section 7.03(a) provides an indemnity by CMS to Marathon for certain "Taxes" payable after Marathon took over the business in EG.[33]  CMS gave no indemnity, however, for loss of  "Tax Items" or "Tax Attributes."

The SPA defines "Taxes" broadly, as follows:

"Tax" or "Taxes" shall mean any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, premium, windfall profits, environmental, customs duties, capital stock, capital gain, petroleum profits, value added, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, minimum, alternative or add-on minimum, estimated or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or

---

[31]    (...continued)
parties regarding indemnity has been gleaned from the contract, the court will impose a strict construction upon that intent to prevent the indemnity obligation from being broadened beyond the terms of the agreement"); *Tubb v. Bartlett*, 862 S.W.2d 740, 750 (Tex. App. – El Paso 1993, writ denied); *Keystone Equity Mgmt v. Thoen*, 730 S.W.2d 339, 340 (Tex. App. – Dallas 1987, no writ); *Hudson*, 435 S.W.2d at 214.

[32]    *Keystone*, 730 S.W.2d at 340.

[33]    SPA, at 31 ("7.03 Indemnification by Seller.  Seller hereby agrees to protect, defend, indemnify and hold harmless the Buyer Indemnified Parties, the Companies and the Alba Companies from and against, and agrees to pay (a) *any Taxes* (net of any realized Tax benefits associated therewith) of the Companies or the Alba Companies . . . attributable to the time period prior to January 1, 2002 . . .).

not.[34]

This contractual definition of the term "Taxes," which covers "tax of any kind whatsoever," does not include an NOL reduction.  Instead, an NOL reduction is defined as a Tax Item or a Tax Attribute.  The SPA specifically defines "Tax Items" as "items of income, gain, loss, deduction, credit, or other items" required to be included in a tax return.[35]  Notably, Marathon and CMS, the parties to the SPA, did not define "Tax Attributes" in the final agreement.  Indeed, the record reveals that Marathon suggested a definition of the term that would have included an NOL,[36] but that proposal was not incorporated into the signed document.

Steven C. Salch, a tax attorney whose opinions are presented by CMS,[37]

---

[34]    SPA, § 1.01, at 7.

[35]    SPA, § 4.14(a), at 19 (". . . all items of income, gain, loss, deduction, credit or other items (**'Tax Items'**) required to be included in each such Tax Return. . .") (emphasis original).

[36]    Draft of SPA (Appendix 2 to Defendant's MPSJ [Doc. # 16]), at 2:14 (the proposed definition was "the amount of any net operating loss, net capital loss, unused investment credit or other credit (collectively referred to as 'Tax Attributes')").

[37]    Salch is a tax attorney with over 40 years of experience, including experience representing energy companies in tax controversies with foreign tax authorities. Declaration of Steven C. Salch (Appendix 6 to CMS's Response [Doc. # 27]) ("Salch Declaration"), at 6:1, ¶ 3, and 6:3, ¶¶ 7-8.  Although CMS has not formally offered him as an expert, Salch clearly is a person of "knowledge, skill, experience, training, or education" whose "specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue."  FED. R. EVID. 702.  Marathon has not challenged Salch's qualifications or CMS's offer of his declaration, and it now is too
(continued...)

explains that, in the tax field, the words and phrases "Taxes," "Tax Attributes," and "Tax Items" are distinct terms:

> The Stock Purchase Agreement does not contain a definition of "Tax Attributes."  As previously discussed, experienced tax practitioners regard a net operating loss carryforward as a tax attribute, not a Tax Item as defined in the Stock Purchase Agreement.  It is also not a Tax as defined in the Stock Purchase Agreement, and its subsequent utilization is not a tax event within a taxable period prior to Closing.[38]

Marathon does not dispute the distinction between Taxes and Tax Attributes.

The Court is persuaded by Salch's explanation of tax definitions and practices as applicable in international transactions of the nature in issue in this case.  There is nothing to suggest that these sophisticated contracting parties intended to use terminology other than that which was standard in international tax practice at the time.  The term "Tax" (or "Taxes") has a materially different meaning from "Tax Attributes" and "Tax Items."  Thus, the focus for interpreting the scope of CMS's indemnity obligation must be on the $2.75 million tax payment, not the NOL tax attribute.

Marathon argues that "but for" the EG government's tax audits for the years

---

[37]     (...continued)
         late to do so.

[38]     Salch Declaration, at 6:13-14, ¶ 39.  *See id.* at 6:5, ¶ 14 ("Tax attributes are things such as a net operating loss or foreign tax credit available for carryback or carryforward that do not have an income tax effect in the annual accounting period in which they originate.")

1997-2001 and Marathon's settlement of those audits for an $11 million NOL reduction, Marathon would not have paid $2.75 million in "Taxes."   Marathon also points out that the indemnity under Section 7.03(a) does not require that "any Taxes" be paid "for" any particular tax year or period.   From these two points, Marathon deduces that "Taxes" paid "for" tax year 2005 are indemnified *if* the taxes are "attributable to" to a period before January 1, 2002.

The viability of Marathon's argument hinges upon the contractual term "attributable to."   The Court therefore must determine the time period to which the $2.75 million in Taxes are "attributable."

### 2.     "Attributable to"

As noted above, the parties agree that for present purposes $2.75 million in taxes was paid in 2007 for Marathon's earnings in EG during tax year 2005.   There is no dispute that Marathon owed no income taxes on its business dealings in EG for tax years 1997 through 2004, irrespective of the NOL adjustment in the Settlement Agreement.   The parties, however, disagree about the time period to which the $2.75 million in taxes is "attributable" under Section 7.03(a).   For the several reasons explained below, the Court holds that the SPA is not ambiguous and that the taxes paid to EG are "attributable to" the period in which the income to be taxed was earned — in this case, tax year 2005.

The parties argue that their respective positions honor Section 7.03(a)'s plain meaning.  As noted, Marathon maintains that the $11 million NOL reduction provided for in the Settlement Agreement with the EG government related to tax years 1997-2001 and was a "but for" cause of the $2.75 million tax payment.[39]  Marathon then urges that the taxes were "attributable to the time period prior to January 1, 2002."[40] The Settlement Agreement states in this regard:

> As a result of this [S]ettlement Agreement, the cumulative Tax Loss Position of [Marathon] at December 31, 2001 will be reduced by USD $11,000,000 . . .  This Tax Loss position reduction will result in additional taxes paid to the State of USD $2,750,000.[41]

The bilateral language in the Settlement Agreement between Marathon and EG attempts to make the taxes "attributable to" the $11 million NOL reduction for 1997-2001.[42]

---

[39]   EG's tax rate is 25%, and 25% of $11 million is $2.75 million.

[40]   Plaintiffs' Motion, at 13 ("In all events, the Government would not have settled its tax audits for the years 1997-2001 but for Marathon E.G. Production's payment of the $2,750,000.  That sum was, in turn, only due and payable to the Government as the result of the reduction of the NOL for the time period ending December 31, 2001. Hence, the $2,750,000 in taxes was attributable to the time period prior to January 1, 2002, when CMS was responsible for filing the Equatorial Guinea tax returns for the 'Companies' and the 'Alba Companies.'").

[41]   Settlement Agreement, at 1, ¶ 2(d).

[42]   CMS points out that it was a stranger to the Settlement Agreement and therefore that the agreement cannot be relied upon to adjudicate the indemnification dispute between CMS and Marathon.  Marathon relies heavily upon the fact that it had CMS's
(continued...)

Marathon's contentions do not account for routine tax practices.  As explained by Salch, "taxes" are only "attributable to" the tax year in which the taxed income was earned.[43]  By contrast, "tax attributes" are available for carryback or carryforward, and

---

[42]    (...continued)

authority to settle with the EG Government for up to a $13 million reduction in the NOL.  *See* Letter from T. Vogel to M. Boyd, dated April 20, 2005, at 1, ¶ 1 (Exhibit 7 to Plaintiffs' Reply [Doc. # 31]) ("CMS agrees with your suggestion that Marathon offer a reduction of up to $13 million in the [NOL] balance as of December 31, 2001").  Marathon argues that it negotiated vigorously with the EG government, which was initially demanding a much larger NOL reduction—possibly an amount that would have resulted in a taxpaying position for tax year 2001—and successfully settled with EG for a NOL reduction of only $11 million.  However, the communications between Marathon and CMS that authorized the $13 million NOL reduction simultaneously included explicit reservations of CMS's rights and restatements of its position that the NOL settlement did not require indemnification of the tax payment.  *See id.* at 1, ¶ 4 ("We do not authorize any payment of any sort attributable to taxable years prior to 2002").

[43]    Salch states:

> Income tax accounting in the United States and in Equatorial Guinea is based on the fundamental principle that taxable income or loss and tax liability is predicated on the taxable year, an annual accounting period ending on the last day of a calendar month. . . . To an experienced tax practitioner, the annual accounting period axiomatically dictates that taxable items are attributed to the taxable year in which they must be included in the calculation of taxable income and that ***taxes are attributed to the annual accounting period with respect to which the liability to pay the tax arises based on the taxable income for the same period***.

Salch Declaration, at 6:5, ¶ 13 (emphasis added).  He adds:

> As long as a taxable year has ***zero taxable income, there is no income tax attributable to that year*** under the annual accounting period principle. . . .

(continued...)

may be utilized over multiple tax years.[44]  In other words, a tax attribute such as an NOL often originates in one taxable year (the "loss year"), but has a tax impact in a subsequent taxable year, based upon the income in that subsequent year.[45]  In fact, unless the NOL has a limited carryforward period, its original year is not relevant.[46]

Salch's opinion is uncontradicted and is persuasive.  Moreover, applicable Texas state law concerning the interpretation of contracts dictates that Salch's views should govern.  When examining a contract's wording, the Court must "ascertain the meaning that would be attached to the wording 'by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended to mean.'"[47]  The Texas Supreme Court, in *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968), stated that a court is not limited to "the literal meaning" of a contract's words:

> Williston on Contracts § 610 . . . states that "though Courts say they are
> seeking the intention of the parties, the assertion is even more emphatic

---

[43]   (...continued)
       *Id.* at 6:6, ¶ 17 (emphasis added).

[44]   *Id*. at 6:5, ¶ 14.

[45]   *Id.* at 6:5-6, ¶ 15; *id.* at 6:16 (Table 1).

[46]   *Id.* at 6:6, ¶ 16.

[47]   *Watkins*, 689 F.2d at 538 (quoting *Sun Oil*, 626 S.W.2d at 731).

that this intention can be found only in the expressions of the parties in the writing.  In effect, therefore, it is not the real intent but the intent expressed or apparent in the writing which is sought."  Williston goes on to say, however, that "***this does not limit the Court to the literal meaning of the words***, for while omitted restrictions will not be implied in otherwise clear and general promises, yet the terms of the contract may themselves show such an intent on the part of the parties . . . . Likewise, ***the Court will consider the characterizing circumstances that surround the execution of a contract*** and where the terms are still not clear the Court will hear oral testimony 'to ascertain the intent of the parties as expressed by the language used.'"[48]

The Court therefore is persuaded in a fresh analysis of SPA Section 7.03(a), the parties' cited authorities, the admissible record in this case, and basic logic, that taxes are attributable only to the time period for which the taxing authority imposes the tax, and thus Marathon's 2005 tax payment of $2.75 million is not attributable to the period prior to January 1, 2002.  Although the $11 million NOL reduction may be "attributed to" the years 1997 through 2001 under the Marathon Settlement Agreement with EG, SPA Section 7.03(a) does not provide indemnity to Marathon for a reduced NOL, but only for additional "Taxes" attributable to pre-2002 years.  The $2.75 million in "Taxes" are attributable to tax year 2005 and do not give rise to an indemnity in Marathon's favor.

>    3.    **Reading the Contract as a Whole: Interplay between Section 4.14's Representations and Warranties and Section 7.03(a)**

---

[48]    *Spooner*, 432 S.W.2d at 518-19.

Texas law requires the Court to interpret Section 7.03(a) in harmony with the whole contract.[49]  The Court accordingly must read Section 7.03(a) together with Section 4.14(a), which appears in Article IV concerning "Representations and Warranties of Seller."  In Section 4.14(a), CMS warranted *inter alia* that the "Tax Items" on CMS's tax returns—including the NOL that later was reduced by the Settlement Agreement—were correct.[50]

CMS, however, provided in the SPA ***no indemnity*** for a breach of the Section 4.14(a) warranty on "Tax Items."[51]  Section 7.03(a) only created an indemnity for

---

[49]    *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994).

[50]    Section 4.14(a) states:

> All returns, reports, and declarations of estimated tax with respect to any Tax which are required to be filed on or before the Closing Date by or with respect to the Companies or, to the Knowledge of Seller, the Alba Companies (the "Tax Returns") have been or will be duly and timely filed, ***all items of income, gain, loss, deduction, credit or other items ("Tax Items") required to be included in each such Tax Return are true, correct, complete and in accordance with applicable Laws*** and all such Tax Returns reflect all liabilities for Taxes for the periods covered by such Tax Returns, all Taxes shown as due on each such Tax Return have been or will be timely paid in full . . . .

SPA, at 19 § 4.14(a) (emphasis added).

[51]    Section 7.03 does, however, indemnify for breach of a different  representation in Section 4.14.  In Section 7.03(c), CMS agrees to indemnify against "any increase in Taxes of a Buyer Indemnified Party resulting from a breach by Seller of its representation in Section 4.14(j)."  SPA, at 31 § 7.03(c).  As held in the previous M&O, at 10 n. 22, Section 7.03(c), unlike Section 703(a), indemnifies against
(continued...)

"Taxes," a different defined term in the SPA.   The absence in Section 7.03(a) of an

indemnity for breach of Section 4.14(a)'s warranty provides further support for

CMS's reading of Section 7.03(a).

### 4.   Prior Drafts of the SPA

The Court's decision is also supported by admissible evidence concerning the

Marathon/CMS contract negotiations.   At some point, Marathon proposed broad

language for Section 7.03, which included an explicit indemnity for an NOL

reduction:

> It is understood, however, that Seller [CMS] shall pay all Taxes resulting
> from the transaction contemplated under this Stock Purchase Agreement
> and that *Seller [CMS] shall be liable for any Tax occurring after*
> *December 31, 2001 to the extent a net operating loss deduction is*
> *reduced* or disallowed by the relevant Governmental Authority or a
> depreciation deduction is reduced or disallowed for basis incurred prior
> to January 1, 2002 . . .[52]

This proposed indemnity, however, was not included in the final SPA.  Moreover, in

the same draft, Marathon proposed a subsection (c) that would have provided an

indemnification for the "Tax Items" warranted in Section 4.14(a):

> Seller [CMS] agrees to protect, defend, indemnify and hold harmless
> [various parties including Marathon] from and against, and agrees to pay

---

[51]    (...continued)
        increased U.S. taxes.

[52]    Draft of SPA (Appendix 2 to Defendant's MPSJ [Doc. # 16]), at 2:24 (emphasis
        added).

.  .  .  .  (c) any liability arising from a breach by Seller of its representations, warranties and covenants in Section 4.14 and Article VII.[53]

However, again, Section 7.03's final language did not include the requested indemnify for a breach by CMS of any and all representations in Section 4.14.  Ultimately, Marathon obtained only an indemnity for a breach of 4.14(j), which relates to increased United States taxes and is inapplicable here.[54]

Marathon also proposed an additional representation or warranty, included in a draft as Section 4.14(m):

> Schedule _____ sets forth as of the date hereof (i) the basis of the Companies and the Alba Companies in its assets for Equatorial Guinea Income Tax purposes, and (ii) the amount of any net operating loss, net capital loss, unused investment credit or other credit (collectively referred to as "Tax Attributes") of the Companies and the Alba Companies for Equatorial Guinea tax purposes.  These Tax Attributes will be available to Buyer.[55]

This requested addition would have applied to the NOL reduction at issue in this case.

However, Section 4.14(m) also was not included in the final SPA.

The Court may look to these prior drafts of the SPA, and to rejected language,

---

[53]     *Id*. at 2:23-24.

[54]     SPA § 7.03(c), at 31.

[55]     Draft of SPA (Appendix 2 to Defendant's MPSJ [Doc. # 16]), at 2:14.

when determining the parties' intent.[56]   In *Spooner*, the Texas Supreme Court specifically cited to proposed contractual language, requested by one party, using the "book value" of a company in a potential future transaction.  The other contracting party rejected the proposed language, and the parties subsequently agreed to use "then market value" instead of book value.[57]   The *Spooner* Court resolved the parties' dispute after considering a rejected proposed draft, stating that the "intention of the parties" was "clear from all of the language used in the contract, considered in the light of the surrounding circumstances, and the pertinent rules of construction."[58]

The sequence of events regarding Marathon's requested additions to Section 7.03, and its proposal of Section 4.14(m), supports CMS's argument.  Marathon explicitly asked for an indemnity against a reduction of the NOL carryforward, but subsequently signed a contract that did not contain the indemnity.  The record evidence, including the parties' rejected draft language, supports the conclusion that

---

[56]   *Spooner*, 432 S.W.2d at 518.  Prior drafts are not oral evidence and may be considered by the Court. *Id.* (the Restatement's standard of interpretation for an integrated agreement looks to the meaning that would be attached to the writing by a "reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, ***other than oral statements by the parties of what they intended it to mean***") (quoting RESTATEMENT OF THE LAW OF CONTRACTS § 230 (1932)) (emphasis added).

[57]   *Spooner*, 432 S.W.2d at 519.

[58]   *Id.*

Section 7.03(a) did not indemnify Marathon against reduction of the NOL carryforward.[59]

## IV.   CONCLUSION

Having applied the governing rules of contract construction, the Court holds that Section 7.03(a) is not ambiguous and favors CMS's construction.  The Court has carefully considered the circumstances surrounding creation of the SPA, and the SPA as a whole, as well as the operative usage of the term "attributable to" in the international tax field.  There is no genuine dispute that CMS contracted to indemnify Marathon for "Taxes" owed for the period during which CMS owned the company, but CMS did not contract to indemnify for loss of a "Tax Item" or "Tax Attribute." Plaintiff Marathon's reading of the term "attributable to" is not reasonable in context. Having determined the parties' intent, CMS is entitled to strict construction of the SPA's indemnification provision so as not to extend the agreed indemnity beyond its

---

[59]   The Court further observes that a footnote to CMS's financial statements, which are attached as Schedule 4.05 to the SPA, expressly notes the uncertainty that the NOL would ever be realizable:

> CMS EG LTD has generated approximately $27.8 million [NOL] carry forwards to offset future [EG] income tax obligations.  CMS EG TLD [sic] has established a valuation allowance against this deferred tax asset due to the uncertainty of future recoverability of the asset.

SPA (Exhibit 1 to Plaintiff's Response [Doc. # 18]), at Bates-stamped page M006280.

plain terms.[60]  The Court therefore concludes that Marathon fails to raise a genuine fact issue that it is entitled to an indemnity under Section 7.03(a) and summary judgment in favor of CMS is warranted.

For all of the foregoing reasons, it is hereby

**ORDERED** that the analysis and legal conclusions in the Court's Memorandum and Order entered May 8, 2008 [Doc. # 24] are **WITHDRAWN**.  It is further

**ORDERED** that, upon reconsideration and in light of the more complete record and briefing, CMS's Motion for Partial Summary Judgment [Doc. # 16] is **GRANTED**.  It is further

**ORDERED** that Plaintiffs' Motion for Partial Summary Judgment [Doc. # 26] is **DENIED**.  It is further

**ORDERED** that Defendant's Unopposed Rule 56(f) Motion for Continuance as to Damages is **DENIED as moot**.

SIGNED at Houston, Texas, this **30th** day of **July, 2008**.

Nancy F. Atlas
United States District Judge

---

[60]     *McClane*, 634 F.2d at 859.